UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-21028-CR-ALTONAGA

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

NESTOR COLLANTES,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, Nestor Collantes's ("Collantes['s]")

Renewed Motion for Judgment of Acquittal [or] Motion for New Trial (the "Motion") [ECF No.

683], filed on April 25, 2011.  The Court has carefully considered the parties' written submissions,

the record, and applicable law.

### I.  BACKGROUND

On September 28, 2010, a Grand Jury indicted Mr. Collantes on the following charges: Count

One for Conspiracy to Commit Bank Fraud (18 U.S.C. §§ 1344, 1349), and Count Two for Bank

Fraud (18 U.S.C. §§ 1344(1) and (2)).  (*See* Sec. Sup. Indict. [ECF No. 418]).  Mr. Collantes

proceeded to trial with Co-Defendant, Alfonso Velasco, on March 14, 2011, and a jury found him

guilty on both counts.  Mr. Collantes now seeks a judgment of acquittal notwithstanding the verdict

pursuant to Federal Rule of Criminal Procedure 29(b) or alternatively, a new trial in the interest of

justice pursuant to Rule 33(a) because of errors he claims occurred during the trial.  (*See* Def.'s Mot.

2).

The following summary of the trial evidence is presented in the light most favorable to the

Case No. 09-21028-CR-Altonaga

Government.  Mr. Collantes started and owns his own company, Miami Business Telephone, a company that provides the "most advanced technology" in the design, installation and repair of telecommunications equipment.  It has contracts with the state and with local governments.  Mr. Collantes is responsible for the technical aspects of the business, including reading requests for proposals issued by potential clients.  Mr. Collantes speaks and understands English, but his primary language is Spanish.  If he has difficulty communicating in English, his daughter assists him.

Before his purchase of a unit at the Jade condominium building in Miami, Florida, the purchase at issue in this case, Mr. Collantes had extensive experience in real estate.  He had purchased several properties and had taken out multiple mortgages since as early as 1989.  In each instance he received funding for a portion of the purchase price.  Before his purchase of the Jade property with a $1.5 million loan, the largest loan Mr. Collantes had ever obtained was for $248,000.

The Jade is a luxury 50-story condominium building.  It contains a spa, health club, waterfront pools, steam rooms, saunas, and 24-hour valet and concierge services.  According to the Government, several conspirators joined together to defraud Wells Fargo Bank of millions of dollars by purchasing condominiums at the Jade, inflating the purchase prices of Jade units, and cashing out the difference between the actual purchase prices and the inflated prices.  The illegal proceeds were distributed among the conspirators, including a realtor, title agent, bank loan officer and buyers of the units.

The conspiracy's organizer, Greta Medina, used realtor, Margaret Roberts, to negotiate the purchase and sale contracts, have the contracts executed, and prepare fraudulent contracts reflecting inflated prices of Jade units.  The title agent, Karim Goding, prepared the title documents, including

2

false and fraudulent "double" HUD statements — one with the actual price to be given to the seller and the other with the inflated price to be given to Wells Fargo.  Wells Fargo loan officer, Ricardo Estrada, passed the fraudulent loans through Wells Fargo and was paid $10,000 per deal for his "work."  Buyers of the Jade units lent their credit in exchange for receiving part of the cash out and control over the assets that would be sold at a later time.

Ms. Goding's role was to assist the conspiracy by releasing loan proceeds before closing to allow the buyers to use those funds to purchase cashier's checks to pay cash to close consistent with the cash to close payments disclosed on the settlement statements.  Ms. Goding required the buyers to return cashier's checks to her on the settlement date or the next day after the closing.  Cashier's checks made the buyers appear legitimate by concealing that they were not investing their own money into the transactions as represented to Wells Fargo.  Ms. Goding would receive $8,000 in cash on certain of the Greta Medina deals, and the buyers would be paid for their roles through the fraudulent loan proceeds.

Mr. Collantes attended the closing to purchase his unit at the Jade and signed documents at the closing.  He later admitted to United States Secret Service Agent Michelle Japak that he knew at the time of closing he could not afford the unit.  He admitted to her that without renting the unit he knew he would not be able to make the payments.  He also admitted he did not know how he could have qualified to obtain financing to purchase the unit, but he did not ask any questions.

The loan application Mr. Collantes signed at the closing states he made approximately $38,000 per month.  This information was important to Wells Fargo in deciding whether to approve the loan to Mr. Collantes.  But the amount was significantly inflated, as admitted by Mr. Collantes

in his statement to Agent Japak and as shown by Mr. Collantes's official tax returns.

There were additional misrepresentations on Mr. Collantes's loan application that were important to Wells Fargo in approving the loan. The sum of $831,000 appears as Mr. Collantes's bank account assets listed on the loan application. This amount was greatly inflated. Financial auditor, Lewis Sellars, testified that Mr. Collantes's official records from Regions Bank showed a balance of $102,046 at the time of the loan application. Mr. Collantes also represented in the loan application that he had paid his down payment of $628,973 from "savings." In truth, Mr. Collantes never made a down payment of that amount, and he did not use funds derived from "savings." Mr. Collantes represented he was purchasing the Jade unit as his primary residence, and repeated this in the certificate of occupancy, which also stated he would reside at the Jade unit within 60 days of closing. This representation allowed Mr. Collantes to obtain a more favorable interest rate on the loan than he otherwise would have qualified for. That he intended to reside at the Jade unit was not true, as Mr. Collantes admitted to Agent Japak and as evidenced by a signed lease agreement with Christina Aboud, which provided for a term to begin upon closing.

With regard to the seller's settlement statement, that document stated the purchase price was $1.18 million, whereas the settlement statement provided to the lender listed a purchase price of $2.1 million. The lender settlement statement provided that Mr. Collantes would bring $617.402.10 as cash to close. Mr. Collantes never brought this amount; rather, he paid $17,402.10 funded by the lender. Erick Wesoloski, Mr. Collantes's counsel hired to arrange a short sale much later, testified that to the extent only $17,402.10 was paid at closing and the lender's HUD form provided for a cash to close payment of $617,402.17, that was an indication of fraud.

At the time of the closing for Mr. Collantes's Jade unit, Ms. Goding wired $314,480 to a joint account between Christian Gomez and his wife.  That money represented "what was left of the cash-out after paying . . . the initial down payment that needed to be paid prior to closing."  (Trial Tr. III 119:19–21 [ECF No. 630]).  Mr. Gomez's role was to accept the illicit proceeds in his bank account from the title company and distribute those funds to his co-conspirators.  Mr. Gomez understood that in accepting the money and distributing it to the co-conspirators, including Mr. Collantes, what he was doing was wrong.  Mr. Gomez understood he was forwarding money to Mr. Collantes so Mr. Collantes could pay the cash to close "which he [Mr. Collantes] was supposed to have already."  (Trial Tr. X 26:18-19 [ECF No. 653]).

After the funds were wired into his account, Mr. Gomez went with Obed Hernandez to Bank of America to obtain cashier's checks to distribute to the co-conspirators.  Mr. Gomez purchased and distributed cashier's checks in different amounts for Mr. Hernandez, Ms. Medina, and Capital RM, Inc.; and as to Mr. Collantes, Mr. Gomez purchased a cashier's check for $137,402.10.  After he purchased the checks, Mssrs. Hernandez and Gomez went to Union Planters Bank.  Mr. Hernandez then called Mr. Collantes and told him to meet them at Union Planters Bank.

When Mr. Collantes arrived, Mr. Gomez gave him the $137,402.10 check.  Mr. Collantes deposited the check, withdrew $17,402.10 from his account, and purchased a $17,402.10 cashier's check made payable to the title company, Futuristic Title.  Mr. Collantes handed the check to Mr. Hernandez, and Mssrs. Gomez and Hernandez drove to Futuristic Title with the cashier's check.

The cashier's check given to Ms. Medina was for $44,269.  She used a portion of her funds to pay Wells Fargo loan officer Estrada for the transaction.  After depositing the check into her Bank

Case No. 09-21028-CR-Altonaga

of America account, Ms. Medina purchased two cashier's checks, remitter "Greta Medina, Collantes closing," payable to a "J.M." On that same date, J.M. wrote a check to Mr. Estrada in the amount of $10,000.

Shortly thereafter, Mr. Collantes signed a lease agreement with Christina Aboud for his Jade unit for the term June 1, 2005 to May 31, 2006. There are several irregularities associated with the agreement. Instead of requiring a lump sum rent payment up front, the lease provided for monthly payments of $8,750. Notwithstanding that provision of the agreement, there is no record of such payments being made to Mr. Collantes. While the lease provides for a $106,000 deposit and states the deposit should be returned upon lease termination, it also states the tenant must vacate if Mr. Collantes obtains a buyer.

Within six months of purchasing his unit, Mr. Collantes tried to sell it. In November 2005 he entered into an exclusive real estate listing agreement. In February 2006 he entered into a purchase and sale agreement to sell the property for $1.7 million, but before terminating the agreement, he entered into a second purchase and sale agreement with Eva Hernandez, Obed Hernandez's mother, for $2.2 million. Mr. Collantes knew that Mr. Hernandez was using his mother's credit to purchase the unit, he was not paying maintenance at the Jade at the time, and he had written bad checks to the Jade to make the maintenance payments.

Mr. Collantes sold the Jade unit at a short sale negotiated with Wells Fargo by his counsel, Mr. Wesoloski. Mr. Wesoloski testified that a short sale was preferable to a foreclosure because individuals who work for public entities sometimes suffer negative employment consequences if they foreclose on property. As part of his review of the Jade loan documents, Mr. Wesoloski advised Mr.

Collantes that it appeared there had been mortgage fraud in connection with the transaction. Because

of the documentation submitted in connection with the short sale showing Mr. Collantes could not

afford to make payments on the unit, Wells Fargo approved the short sale and relieved Mr. Collantes

of his obligation to repay the $782,000 loss sustained by Wells Fargo.

Prior to being indicted, Mr. Collantes gave two material statements to law enforcement. In

his first statement to Special Agent Japak, Mr. Collantes stated he had paid the cash to close using

his own funds. He also told Agent Japak he had not received any monies from other parties to pay

the cash to close and had not received any money from anyone else before, during, or after the

transaction. In a second statement, he told the agent he had not paid cash to close as part of the

closing on the unit. When shown the $17,402.10 check to the title company with his name as the

remitter, Mr. Collantes stated he had no recollection of the check despite the amount and the

circumstances under which he had purchased it. When shown the $137,402.10 check from Mr.

Gomez, Mr. Collantes claimed the payment was advanced rent money even though the amounts to

be paid under the terms of the lease to Ms. Aboud did not match the payment received by Mr.

Collantes from Mr. Gomez.

Mr. Collantes was charged with, and convicted of, two Counts. Count One, alleging

conspiracy to commit bank fraud in violation of 18 U.S.C. sections 1344 and 1340, requires proof

beyond a reasonable doubt that: (1) two or more persons agreed to try to accomplish a common and

unlawful plan to commit bank fraud; and (2) the Defendant knew the unlawful purpose of the plan

and willfully joined in it. Count Two, alleging bank fraud in violation of 18 U.S.C. section 1344,

requires proof beyond a reasonable doubt that: (1) the Defendant participated in a scheme to defraud

a financial institution or to get money, assets, or other property from a financial institution by using

false or fraudulent pretenses, representations or promises about a material fact; (2) that the false

pretenses, representations or promises were material; (3) that the Defendant intended to defraud the

financial institution; and (4) that the institution was federally insured.

## II.  LEGAL STANDARDS

Mr. Collantes seeks the entry of a judgment of acquittal under Federal Rule of Criminal

Procedure 29(c).  Rule 29(c) "tests the sufficiency of the evidence against defendant, and avoids the

risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of

guilt." 2A CHARLES A. WRIGHT & PETER J. HENNING, Federal Practice & Procedure: Criminal § 461

(4th ed. 2010) (footnote call numbers omitted).  Under Rule 29(c), "a district court should apply the

same standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United

States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999) [hereinafter *Ward I*].  This means a "verdict

of guilty must stand if there is *substantial evidence* to support it." *United States v. Toler*, 144 F.3d

1423, 1428 (11th Cir. 1998) (contrasting the Circuit's earlier incorrect view that only "slight

evidence" was needed to support a conspiracy conviction) (emphasis added). Any conflicts in the

evidence are resolved in favor of the Government, and all inferences that tend to support the

Government's case must be accepted. *See Ward I*, 197 F.3d at 1079.  When the Government relies

on circumstantial evidence, however, "reasonable inferences rather than mere speculation, must

support conviction." *United States v. Suttles*, 297 F. App'x 887, 888 (11th Cir. 2008) (citation

omitted).  The Court is to determine "whether a reasonable jury could have found the defendant

guilty beyond a reasonable doubt." *Ward I*, 197 F.3d at 1079 (citations omitted); *see also United*

*States v. Medina*, 485 F.3d 1291, 1296–97 (11th Cir. 2007).

Alternatively, Defendant moves under Federal Rule of Criminal Procedure 33 for a new trial because "the interests of justice so require." (Mot. 2). The power of a court to grant a new trial is much broader than the power to grant a motion for acquittal. *See United States v. Ward*, 274 F.3d 1320, 1323 (11th Cir. 2001); *see also* 3 WRIGHT & HENNING § 553. In reviewing a motion for a new trial, "a district court may weigh the evidence and consider the credibility of the witnesses." *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004) (citation omitted). "However, . . . the court 'may not . . . set aside the verdict simply because it feels some other result would be more reasonable. The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *Id.* (quoting *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985)).

### III. ANALYSIS

In his Motion, Mr. Collantes raises several arguments, and the Court addresses them in the order Mr. Collantes presents them. Mr. Collantes first asserts two errors compel the grant of a new trial: (1) the Court's refusal to grant Mr. Collantes's motion to compel immunity for witness M.A.; and (2) the Court's denial of a motion for mistrial based on the testimony of Agent Japak that like Mr. Collantes, other buyers did not receive money directly from the title companies involved. Mr. Collantes then raises three arguments in support of his motion for judgment of acquittal: (1) the Government failed to prove his knowledge of the conspiracy alleged in Count One and his intention to join or associate himself with the objectives of the conspiracy; (2) the Government failed to prove his knowledge of the fraud and his intent that the fraud be committed, as alleged in Counts One and

Case No. 09-21028-CR-Altonaga

Two; and (3) the Government failed to establish venue.

### A.      Motion for New Trial

   *1.      Denial of Defendant's Motion to Compel Immunity for Witness M.A.*

M.A., listed as a Government witness, is the real estate associate who introduced Mr. Collantes to Mr. Hernandez.  According to the Defendant, M.A. received a payment outside of the closing for acting as the Defendant's broker, and M.A.'s role helped insulate Mr. Collantes from knowledge of the conspirators' activity.  M.A. advised Mr. Collantes, through M.A.'s attorney, that if he were called to testify at trial, M.A. would assert his Fifth Amendment privilege against self-incrimination and refuse to testify.  The Government did not grant M.A. immunity and removed M.A. from its witness list.  Consequently, at the start of trial Mr. Collantes moved the Court to grant use immunity for M.A. or alternatively, allow oral statements made by M.A. to the Government and summarized in an agent's report to be read to the jury.  The motion was denied.  Mr. Collantes now asserts he should be granted a new trial as, without the grant of immunity or at a minimum the reading of M.A.'s statement, Mr. Collantes was deprived of the opportunity of presenting exculpatory evidence.

The Court has no authority to grant immunity to a defense witness even if the defense witness possesses exculpatory information unavailable from other sources. *See, e.g., United States v. Cuthel*, 903 F.2d 1381, 1384 (11th Cir. 1990); *United States v. Sawyer*, 799 F.2d 1494, 1506–07 (11th Cir. 1986).  And while a "compelling argument could be made for judicially compelled use immunity in cases of governmental abuse of the immunity process," *Sawyer*, 799 F.2d at 1507, there is no

evidence of such misconduct in this case.

Regarding Defendant's alternative request for a reading of the agent's report containing the agent's summary of M.A.'s statement, such report was not M.A.'s statement, and hence could not be read to the jury. *See United States v. Jordan*, 316 F.3d 1215, 1255 (11th Cir. 2003) ("Government agents' reports of witness interviews and summaries of those interviews are not *Jencks Act* statements unless they are (1) substantially verbatim, contemporaneously recorded transcripts, or (2) signed or otherwise adopted by the witness."). Even if the report could be considered M.A.'s statement, there was no showing that it was self-inculpatory as required under Federal Rule of Evidence 804(b)(3), and thus it was inadmissible as hearsay not falling within any recognized exception. *See, e.g., United States v. Thomas*, 62 F.3d 1332, 1336–38 (11th Cir. 1995). Finding no error in the rulings announced during trial regarding M.A., Defendant's motion for a new trial on this ground is unavailing.

### 2. *Motion for Mistrial Based on Agent Japak's Testimony*

One of the arguments presented by Defendant in counsel's opening and closing statements to the jury was that his transaction was markedly different from the transactions conducted by the other buyer-conspirators because unlike the others, Mr. Collantes did not receive money directly from the title company. In other words, Defendant sought to show that he was insulated by the other conspirators involved in his transaction from knowing about the bank fraud and the conspiracy. On redirect examination, and outside the scope of the cross-examination, Agent Japak testified that other buyers charged in the conspiracy, such as Yosmel Caballero, Dania Arguelles, and Leismy Barcia, similarly did not receive money directly from the title company. Defense counsel's objection was

initially overruled, but the following day the Court acknowledged the objection should have been sustained.  At the Court's direction, the parties were instructed to prepare a curative instruction which was read to the jury: "On redirect examination, if you may recall, Agent Japak testified about the source of monies that were paid to some other buyers who did not testify and whose documents have not been introduced into evidence.  I have ordered that testimony stricken which means that it should not be considered by you, discussed by you, or taken into account in any manner during your deliberations."  (Mot. 8-9) (citation omitted).

The Defendant maintains the improperly admitted testimony was unduly prejudicial because counsel was not able to effectively re-cross examine Agent Japak given that the other buyers were never on the Government's witness list, their records were not on the Government's exhibit list, and counsel had relied on these omissions in conducting his pre-trial preparation.  The agent's testimony summarized extrinsic records on a salient point in a case that, according to the Defendant, did not consist of overwhelming evidence against Mr. Collantes.  Furthermore, Defendant asserts the stricken testimony "struck at the heart of Mr. Collantes' defense," regarding Mr. Collantes not receiving payments directly from the title company and hence lacking knowledge of a conspiracy. (Mot. 9).  These arguments fail to persuade that a new trial is warranted in the interests of justice.

While the buyers addressed by Agent Japak in the stricken testimony were not on the Government's witness list, nor were their records on the exhibit list, Defendant elicited testimony about these very buyers on cross-examination from cooperating Government witnesses Mss. Goding and Roberts, who testified prior to Agent Japak.  The Government explains that these witnesses were effectively cross-examined because the Government had produced, as early as April 2010, financial

documents and witness statements about the other buyers, and counsel had clearly reviewed and absorbed the information related to these other buyers.  The prejudice resulting from the stricken testimony related to only one similarity between Mr. Collantes and the other buyers — that they were paid by other members of the conspiracy and not from the title company — contrary to the representations of counsel.  As to this point, the jury had already considered evidence that another buyer, Ana Aviles, had received a kickback outside of closing from another conspirator rather than directly from the title company, like the Defendant.  Given the strong curative instruction given and the weight of the evidence, which is addressed separately below, any prejudicial impact of the inadmissible hearsay statement of Agent Japak was alleviated and a new trial is not warranted.  *See United States v. Puckett*, 330 F. App'x 817, 820 (11th Cir. 2009) ("Where the district court issues a curative instruction, we will overturn . . . only where the evidence is so highly prejudicial as to be incurable . . . . [W]e presume that the jury followed the . . . curative instruction."); *United States v. Bujanda-Rojas*, 133 F. App'x 675, 678-79 (11th Cir. 2005) (no abuse of discretion in denying motion for mistrial after court struck testimony that defendant was a "deported felon" given other evidence of defendant's guilt and the curative instruction given).

**B.      Motion for Judgment of Acquittal**

   *1.      Count One: Conspiracy*

   For Mr. Collantes to be convicted of conspiracy, the Government must establish that a conspiracy existed, Mr. Collantes knew of the conspiracy, and Mr. Collantes, with knowledge, voluntarily joined the conspiracy.  *Toler*, 144 F.3d at 1425–26.  A conspiracy is an "agreement to commit an unlawful act."  *Id.* at 1425 (citation omitted).  "The agreement is the 'essential evil at

which the crime of conspiracy is directed,' and 'agreement remains the essential element of the crime.'" *Id.* (quoting *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975)).  "Proof of a true agreement is the only way to prevent individuals who are not actually members of the group from being swept into the conspiratorial net." *United States v. Chandler*, 388 F.3d 796, 806 (11th Cir. 2004).   Nevertheless, "the government need not demonstrate the existence of a formal agreement . . . , but may instead demonstrate by circumstantial evidence 'a meeting of the minds to commit an unlawful act.'" *Toler*, 144 F.3d at 1426 (quoting *United States v. Awan*, 966 F.2d 1415, 1434 (11th Cir. 1992)) (other internal citations omitted); *see also United States v. Morales*, 868 F.2d 1562, 1574 (11th Cir. 1989) (A conspiracy "is rarely proven by direct evidence that the conspirators formally entered or reached an agreement.").

A defendant's participation in the agreement must be knowing and voluntary.  *See Chandler*, 388 F.3d at 806; *see also Toler*, 144 F.3d at 1425–26 ("It is axiomatic that the existence of an agreement necessarily implies knowledge of the object of the agreement and the voluntary expression of assent to participate in its objectives.").   With regard to knowing, voluntary participation, "[m]ere presence at the scene of a crime, although a factor for a conspiracy conviction, is not by itself sufficient to support a conspiracy conviction," and mere association with conspirators is also insufficient to support a conviction. *United States v. Balderas*, 163 F. App'x 769, 779 (11th Cir. 2005).  Nonetheless, "[i]t is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy." *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998).  In sum, the Government "must prove beyond a reasonable doubt that the conspiracy existed, that the defendant *knew* about it and that he voluntarily agreed to join it."

Case No. 09-21028-CR-Altonaga

*Chandler*, 388 F.3d at 806 (citing *United States v. Hernandez*, 896 F.2d 513, 519 (11th Cir. 1990) (emphasis in original)).

Circumstantial evidence of Mr. Collantes's knowledge of the conspiracy and agreement to join it is certainly strong and supports the jury's verdict. Mr. Collantes, an experienced businessman and purchaser of several properties prior to the Jade unit purchase, admitted to Agent Japak that he attended a closing to purchase the unit and that he signed the loan documents. He admitted the representations contained in the loan application regarding his salary and bank assets were inflated. Mr. Collantes's representations that he intended to live at the property as his primary residence were contradicted by the lease with Aboud and his daughter's own testimony. Bank and tax records confirm the fraudulent nature of Mr. Collantes's representations to the lender in the loan documents. Similar to Adan Vazquez, an unqualified buyer who testified at trial, Mr. Collantes admitted he knew he could not afford the property when he purchased it.

Mr. Collantes knew from his meeting with his short sale lawyer, Mr. Wesoloski, that the Jade loan documents contained evidence of fraud. Thereafter, and armed with the knowledge imparted by Mr. Wesoloski, Mr. Collantes met with the agent a second time and lied about material facts. He lied that he had paid cash to close with his own funds. He lied that the $137,402.10 payment was for advanced rent, as the kickback does not match any rent amount shown on the lease agreement. Given the circumstances under which he acquired it, he lied that he did not recognize a $17,402.00 cashier's check. In a pattern similar to that of other cooperating defendants such as Mr. Vasquez, Mss. Roberts and Goding, Mr. Collantes minimized his role in the conspiracy and lied to the agent the first time he met with her.

Mr. Gomez testified that he distributed the illegal loan proceeds from the deal to the various co-conspirators, including Mr. Collantes. Mr. Gomez met with Mr. Collantes at his bank and gave Mr. Collantes the $137,402.10 cashier's check derived from fraudulent loan proceeds. Mr. Gomez witnessed Mr. Collantes deposit the kickback payment and purchase the $17,402.10 cashier's check payable to Futuristic Title. Mr. Gomez acknowledged he knew the deal was wrong in part because he was delivering proceeds to Mr. Collantes to allow him to pay cash to close. These events are consistent with Ms. Goding's testimony, for she described that part of the scheme was her early release of loan proceeds which were used by the buyers to purchase cash to close checks to conceal the fraudulent nature of the transactions. Auditor Sellars confirmed that Ana Aviles, like Mr. Collantes, had used a portion of the loan proceeds to purchase cashier's checks payable to Futuristic Title at or before closing.

Defendant's claim that the payment represented an advance on rent did not have to be credited by the jury. Mr. Sellars showed that neither the $137,402.10 payment nor the $120,000 payment (netting out the cash to close) matched any of the payments appearing in Defendant's lease agreement with Ms. Aboud. There was no record of the monthly rent payment being made to Mr. Collantes. The lease calls for the return of a $106,000 deposit, and yet there is no record of the deposit being made or returned. Further undermining any suggestion that advance rent was paid, the lease provides the tenant must vacate the property if the property is sold.

Defendant knew he could not afford the Jade unit, and he never asked any questions as to how he was qualifying for $1.5 million in financing. Mr. Collantes made no down payment on a $2.1 million property, contrary to the representation made in his loan application and the settlement

16

statement.  Incredibly, Mr. Collantes accepted a $137,402.10 payment for *purchasing* a $2.1 million

property.  While the Defendant argues in his Motion that the evidence was consistent with his

ignorance of the existence of a conspiracy, "'[i]t is not necessary that the evidence exclude every

reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of

guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond

a reasonable doubt'."  *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008) (quoting

*United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994)).  On this evidence, considered in the light

most favorable to the Government, the jury could find, and did, that the evidence established a

conspiracy existed that Mr. Collantes knew about and voluntarily joined.

> 2.      *Counts One and Two: Knowledge of the Fraud and Intent*

To prove a violation of 18 U.S.C. section 1344(a)(1), the Government must prove the

Defendant "(1) intentionally participated in a scheme or artifice to defraud another of money or

property; and (2) that the victim of the scheme or artifice was an insured financial institution."

*United States v. Goldsmith*, 109 F.3d 714, 715 (11th Cir. 1997) (citation omitted). "Consistent with

the common law definition of fraud, § 1344(1) requires a misrepresentation or concealment of

*material* fact." *United States v. Flanders*, 491 F.3d 1197, 1212 (10th Cir. 2007) (internal quotation

marks and citation omitted; emphasis in original).  To prove a violation of section 1344(a)(2), the

Government must establish "(1) . . . a scheme existed in order to obtain moneys, funds or credit in

the custody of the federally insured financial institution; (2) . . . the defendant participated in the

scheme by means of false pretenses, representations or promises, which were material; and (3) . . .

the defendant acted knowingly." *Goldsmith*, 109 F.3d at 715  (citations omitted).  Proof of the

defendant's specific intent to defraud is required under both of these two subsections. *See id.* at 716.

Defendant maintains any intent on his part to defraud under sections 1344(1) and (2) was not

shown to exist at the time of the false statements, as occurred in *United States v. McCarrick*, 294

F.3d 128, 1290 (11th Cir. 2002), where the defendant's conviction was reversed.  Mr. Collantes

argues that while he signed bank loan and closing documents that contained false information, the

Government did not show he knew or was ever made aware of the falsehoods at the time of the

signing.  Furthermore, he asserts, facts adduced at trial — such as his taking out a home equity line

of credit on his primary residence one month after closing rather than on the supposedly "fraudulent

equity" created in the Jade unit — defeat his contemporaneous intent.

As the Government notes in its Response, in determining a defendant's intent at the time of

closing, conduct occurring prior to signing and subsequent to signing the loan documents is relevant

as long as the conduct is probative of the defendant's intent at the time he signed the documents.

(*See* Response, 27 [ECF No. 696] (citing *McCarrick*, 294 F.3d at 1291 ("As the government notes,

however, evidence of McCarrick's subsequent conduct may be considered if it supports a reasonable

inference as to McCarrick's prior intent."))).  Mr. Collantes's statements to Agent Japak

acknowledging that at the time he signed the documents he knew he could not afford the Jade unit

demonstrate his guilty knowledge and intent at the time he signed the documents.  Mr. Collantes's

acceptance of the $137,402.10 check from Mssrs. Hernandez and Gomez immediately after closing,

and purchase of the $17,402.1 check payable to the title company, which served to conceal the

fraudulent nature of the transaction by making it appear Defendant used his own money to buy the

property, are further evidence of his state of mind at the time of the purchase. Defendant's signing of the sham lease contemporaneous with the closing is also probative of his state of mind.

Again, taking the evidence in the light most favorable to the Government, the Rule 29 motion directed to the fraud count is denied.

3.      *Venue*

Mr. Collantes argues now, as he did at trial, that the Government failed to establish proper venue in the Southern District of Florida. To establish venue, the Government must show by a preponderance of the evidence that the trial occurred in the same district as the criminal offense. *See Untied States v. Males*, 715 F.2d 568, 569–70 (11th Cir. 1983). The Government satisfied its burden through documentary evidence, consisting of the title file showing delivery of the loan proceeds to Executive National Bank on Kendall Drive in Miami, Florida; as well as the wire receipt of the loan proceeds from Futuristic Title to Adriana Gomez showing the wire originated from Executive National Bank in Miami. The HUD-1 settlement statements in the title file signed by the Defendant list a Miami, Florida address for the "place of settlement." The Defendant admitted to Agent Japak that he attended the closing for the Jade unit (located in Miami, Florida), and Ms. Goding testified that her office, listed on the settlement statement as a Miami address, closed the transaction. Based on this and other evidence presented, the Government satisfied its burden of showing venue.

## IV.  CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

Case No. 09-21028-CR-Altonaga

Defendant, Nestor Collantes's Renewed Motion for Judgment of Acquittal [or] Motion for

New Trial **[ECF No. 683]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13th day of July, 2011.


_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record